# EXHIBIT B

Hon. William J. Cahill (Ret.)
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, California 94111
Tel: 415-982-5267
sschreiber@jamsadr.com

## JAMS REFERENCE NO. 1100088763

|  |  |
|---|---|
| REDAPT, INC., | **FINAL ARBITRATION AWARD** |
| Claimant, |  |
| v. |  |
| QCT, LLC, |  |
| Respondent. |  |

Place of Arbitration:  JAMS Offices, San Francisco, California

Dates of Arbitration Hearing:  October 22 through October 26, 2018

Date of Interim Arbitration Award:  January 14, 2019

Date of Final Arbitration Award:  April 12, 2019

The undersigned arbitrator, Judge William Cahill (Ret.) of JAMS was appointed as Arbitrator to this proceeding in accordance with paragraph 6 of the parties' agreement to arbitrate "any business tort claims or causes of action," executed on May 9, 2017.  *See*, Report of Preliminary Hearing and Scheduling Order No. 1, ¶ 4 ("SO No. 1").  The parties further agreed that California substantive law and JAMS Rules and Procedures apply to this proceeding.  SO No. 1, ¶ 9.

The Arbitrator has considered all pleadings, testimony and exhibits and makes the following findings of facts and law.  Any disparity between the Arbitrator's findings and the position of the parties is the result of the Arbitrator's evaluation of the credibility, relevance, and weight of the evidence.

## I.    *Background*

Respondents QCT, LLC and QCH (collectively, "Quanta") manufacture notebook computers, servers and other types of computer equipment.  Customers obtain Quanta's products either directly from Quanta or from resellers or system integrators.  Claimant Redapt, Inc. ("Redapt") is a reseller/system integrator of computer products.

In 2012 Quanta issued a press release stating that it was launching a "Premier Channel Partner" ("PCP") program under which "pre-selected" "channel partners" (*e.g.*, resellers) would obtain "enhanced benefits" including "deal registration," "rebates" and marketing development funds ("MDF").   Trial Exhibit ("Ex") 1.  Quanta employee Nelson Wang and Redapt sales personnel discussed Quanta's interest in having Redapt resell Quanta's products to Redapt customers.  Mr. Wang made a presentation to Redapt's staff and sent a document outlining Quanta's PCP program.  Ex. 4.  Mr. Wang promised that Redapt would "be treated specially, having at least all the benefits lined out in the program," but acknowledged that the program documentation that he sent to Redapt lacked the "lengthy legal documents" that other OEM's produced.  Ex 3.  Redapt completed the "partner program form," returned it to Quanta and asked if it needed to "do anything else to get [Redapt] fully set up and ready to go."  Id.  Mr. Wang stated that the

"ball was in[his] court" to work with the web team at Quanta to set up a reseller site," and stated that he would let Redapt know when that happened.  Id.

In June of 2012, Redapt personnel toured Quanta's assembly facility and shortly thereafter Redapt approached Quanta with a potential deal involving Sony.  Reporter's Transcript ("RT") 108:15-110:12.  The Redapt sales person assigned to the Sony deal, Mr. Bill Colello, testified that he assumed Redapt would receive PCP program benefits from Quanta, but he did not request any specific amounts in rebates or commissions amount for the deal, purportedly because Rick Cantu, Redapt's CEO, handled those details.  Trans 111:25-112:15.  He did, however, request that Quanta sign a non-disclosure agreement. Ex 7.

In August of 2012, Mr. Cantu sent a Quanta a document containing "examples" of the rebate percentages Redapt wanted to receive under Quanta's PCP program.  Ex. 12. Mr. Cantu stated that the numbers were a "starting point for [the parties] to discuss and modify" because he was not familiar with "all the suites of products" Quanta offered.  Id. The percentages Redapt requested depended upon the type of product sold and the quotas reached.  Id.  Mr. Wang did not respond to Mr. Cantu's email.

Ten months later, Mr. Wang's left Quanta and Redapt was introduced to his replacement, Mandy Huang.  Ex 10.  In June of 2013, Mr. Cantu sent Ms. Huang a copy of the same "example" rebate plan he had sent to Mr. Wang.  Ex. 12.  Ms. Huang did not respond.  By September, there was still no agreement between the parties regarding the terms of Quanta's PCP program for Redapt, but the customer requirements for the Sony deal had shifted and instead of purchasing Quanta product indirectly from Redapt, Sony

3

opted to purchase directly from Quanta. Redapt and Quanta negotiated an "agency fee" (or commission) under which Redapt received 3.5% of Quanta's sales of products to Sony for a five-year period. Ex. 13. During the negotiations of this Commission Agreement, Redapt requested a 5% "agency fee," but Quanta refused to provide any more than 3.5% and Redapt accepted. Ex 14.

Under the terms of the Commission Agreement, the parties agreed that the 2012 NDA "has never applied and will not apply to any business relationship" between the parties. Ex 13, p. 1. Quanta agree to pay Redapt a "sale commission" of 3.5% of "the Net Sale Price of Approved Sony Products." Id. p. 2. Commissions were to be paid "on or before the 10th day of the next month." Id. The parties agreed that "upon request" they would "discuss adjustments to the Commission rate quarterly," but that the rate would not change without written agreement between the parties. Id. The Commission Agreement was effective for five (5) years and contained a clause stating that it was "the entire agreement between the parties relating to the subject matter," and that "[n]o modification, waiver, or amendment" was "binding unless stated in a writing signed by" representatives of both parties. Id. p. 4.

After negotiating the Commission Agreement for the Sony products, Redapt indirectly sold Quanta products to several Redapt customers, including Ancestry.com. RT 660:5-661:7. Quanta testified that these sales amounted to approximately $4 million. Id. Quanta did not pay, and Redapt did not demand payment, for rebates, MDFs or commission payments on any of those sales. Id.

In 2014, Uber was expanding its data center and, according to Quanta, Uber emailed Quanta from a link on Quanta's website to request information on Quanta products, although no direct sales occurred as a result of the inquiry. RT 661:18-662:1. Instead, Quanta sold its product to Kovarus, another reseller/systems integrator, for resale to the Uber data centers. RT 662:2-12. Quanta stated that Kovarus wanted to "register" the Uber deal with Quanta, but Quanta refused because Uber had already been in contact with Quanta directly. RT 663:9-17.

Redapt had also been working on Uber's datacenter expansion, using Dell equipment. RT 276:25-277:10. Redapt testified that because of a connection between Redapt sales personnel and Amir Amiri. the Uber procurement manager, Redapt was the sole reseller working on the Uber datacenter. RT 275:24-276:15. Uber determined that it should diversify and use multiple resellers and OEMs for the project and Redapt claims that it suggested that Uber buy product from Quanta. RT 280:9-281:20. In September of 2014, Redapt contacted William Chen from Quanta to obtain a quote on the bill of materials ("BOM") employed for the Uber data center, but Redapt did not inform Quanta that the end customer was Uber. Ex. 19. Quanta provided a quote, but Redapt altered the specs and Quanta provided a revised quote in January of 2015. Id. Redapt was unhappy with the pricing and complained that the end customer was able to get cheaper pricing from a different reseller. Id. Redapt then revealed that Uber was the customer and that Kovarus was the reseller. Id. Quanta immediately agreed to match the price it offered to Kovarus, but asked Redapt to wait until a pending order closed before Redapt informed Uber. Id. Mr. Chen testified that he gave Redapt the same pricing Kovarus received

because Uber negotiated a specific price for equipment destined for the Uber datacenter and Quanta gave all resellers working for Uber the same pricing. RT 722:7-723:3.

Both Redapt and Kovarus supplied Uber with Quanta products in 2015, but Uber subsequently stopped working with Kovarus. RT 311:8-14. In September of 2015, Redapt ordered a very large number of servers from Quanta for Uber, but Quanta could not make the delivery date. RT 315:5-316:23; Tr Ex. 39. When Quanta did ship the equipment to Redapt several months late, Uber had already purchased Dell servers and refused to accept the Quanta product from Redapt. Id. Quanta refused Redapt's request to return the servers and Redapt had to warehouse the equipment and negotiate with Uber to purchase the equipment, as needed, over a two-year period. Id. 316:13-320:25. Redapt required payment from Uber for it could pay Quanta, and thus Redapt was in debt to Quanta for several months. Id.

Quanta testified that it stopped working on the Uber deal with Redapt in September 2015 because Redapt owed Quanta millions of dollars for the servers. RT 731:22-732:2. In 2016, Amir Amiri left Uber and Uber stopped purchasing products from Redapt. RT 357:8-358:8. According to Quanta, Uber's new procurement manager, Sara Keller, had a preexisting relationship with Quanta and Ms. Keller contacted Quanta employee Peter Hsieh to inquire about purchasing equipment directly from Quanta without using a reseller. RT 747:10-19; Ex. 85. Quanta provided Uber with direct pricing and began selling product directly to Uber in 2017 and 2018. RT 748:12-750:12.

Redapt claims that when Ms. Keller joined Uber, she toured Quanta's Shanghai production facility in January of 2016. Shortly after her visit, Uber stopped working with

6

Redapt after Uber complained that Redapt's margin on the equipment it sold to Uber was too high. Redapt asserts that Quanta must have disclosed the pricing it provided to Redapt to Uber, and as a result, Uber discovered Redapt's confidential and protected cost/pricing.

Quanta sued Redapt for payment of outstanding invoices for the products Redapt purchased for the Uber datacenter. The parties settled in 2017 and Redapt released Quanta from any breach of contract claims arising out of the disputed payments. Settlement Agreement ¶¶ 4, 6. Redapt specifically reserved the right to assert future "business tort claims" in an arbitration proceeding. Id.

Redapt filed its Demand for Arbitration with JAMS in October of 2017. Redapt asserts claims for fraudulent misrepresentation, promissory estoppel, unjust enrichment and misappropriation of trade secrets. Redapt claims that Quanta owes Redapt 2% in rebates and 1.5% in MDFs on the $107 million of product that Redapt purchased from Quanta for the Uber project. Redapt also seeks commission of 3.5% on the $50 million of sales that Quanta made directly to Uber. Redapt seeks $2,149,014 in damages based on a "lost margin" of 5% for trade secret misappropriation.

The Arbitrator presided over a five-day hearing on this matter from October 22 through October 26, 2018. The parties submitted post-hearing briefs to the Arbitrator on December 7, 2018, and, per agreement of the parties, the Arbitrator issued an interim award on January 17, 2019. Quanta filed a post-interim award brief seeking reimbursement of attorneys' fees and costs and a request for clarification of certain

portions of the interim award.[1]  Redapt filed a response to Quanta's request for attorneys'

fees and costs on March 5, 2019.  Quanta submitted a reply letter to the Arbitrator on

March 11, 2019 and Redapt submitted a reply letter on March 13, 2019.

## II.    *Analysis*

### A.    *Statutes of Limitation and Latches*

Quanta asserts that Redapt's claims are barred by applicable statutes of limitation

and/or the doctrine of latches.  The statutory period for misrepresentation and unjust

enrichment claims is three years and the statutory period for promissory estoppel claims is

two years.  Between 2012 and 2015, Redapt purchased Quanta products for companies

such as Concur, Ancestry and Switchlife but Quanta did not pay, and Redapt did not seek,

rebates or MDFs on those sales.  Ex. 74; RT 660:12.  Thus, Quanta argues, Redapt was on

notice as early as 2012 that Quanta did not intend to pay rebates and MDFs for every

purchase and yet Redapt failed to pursue its purported rights to these payments until 2017.

Redapt claimed that the sales volume was too small to bother collecting the funds and,

alternatively, that it did not seek compensation because these customers made one-time

purchases and did not plan to continue using Quanta products.  RT 268:17-269:4.

Redapt does not seek damages associated with sales made to Concur, Ancestry and

Switchlife; Redapt's damages request arises out of the purchases made for Uber.  The

Uber purchases were fulfilled in 2016 and are within the minimum two-year statutory

period for Redapt's promissory estoppel claim.  Additionally, evidence of events prior to

---

[1] The Arbitrator grants each of Quanta's requests for clarification: (1) the location specified as the site of the hearing; (2) inclusion of the Arbitrator's determination on Redapt's promissory estoppel claim in the Conclusion Section; and (3) the reference to Kovarus as an "OEM" instead of a "Reseller" in the Facts Section.  The Final Award has been modified accordingly.

2015 may be relevant to establish liability even if that same evidence cannot form the basis for damages.

Quanta has not demonstrated that Redapt's claims are time barred or that the doctrine latches should apply.

### B.     *Redapt's Claims for Misrepresentation and Promissory Estoppel*

Redapt claims that Quanta is liable for both fraudulent and negligent misrepresentations and promissory estoppel.

To establish its claim for fraudulent misrepresentation, Redapt must prove: (1) Quanta represented that an important fact was true; (2) Quanta's representation was false; (3) Quanta knew that the representation was false when Quanta made it or Quanta made the representation recklessly and without regard for its truth; (4) Quanta intended that Redapt rely on the representation; (5) Redapt reasonably relied on the representation; (6) Redapt was harmed; and (7) Redapt's reliance on the Quanta' representation was a substantial factor in causing that harm." *Graham v. Bank of America*, 226 Cal.App.4th 594, 605-606 (2014).

To establish its claim for negligent misrepresentation, Redapt must prove that Quanta (1) misrepresented a past or existing material fact; (2) without reasonable grounds for believing it to be true; (3) with intent to induce Redapt's reliance on the fact misrepresented; (4) that Redapt was ignorant of the truth and justifiably relied upon Quanta's misrepresentations; and (5) resulting damage. *Goonewardene v. ADP, LLC*, 5 Cal.App.5th 154, 175 (2016).

Both claims require Redapt to prove that Quanta made a "positive assertion." *Goonewardene,* Cal.App.5[th] at 175. To establish the damages it seeks, Redapt must prove that Quanta represented and/or promised that it would pay Redapt 2% in rebates, 1% in MDFs and/or 3.5% in commissions for Quanta products sold to Uber. Alternatively, Redapt must prove that Quanta made general representations and/or promises that it would pay 2% in rebates, 1% in MDFs, and/or 3.5% in commissions for sales made to *any* customer if Redapt acted as a qualified reseller.

### 1.   *Evidence that Quanta Represented or Promised that it would Pay Rebates, MDF Funds, or Commissions on the Uber Deal*

The only evidence Redapt produced to prove that Quanta represented and/or promised that it would pay, for the Uber purchases, the percentages of rebates, MDFs and/or commissions that Redapt is seeking is the testimony of Redapt employees.

Mr. Cantu testified that when he first spoke with Peter Hsieh regarding purchasing Quanta product for Uber, Mr. Hsieh stated that the "program was still in place to support these accounts." RT 520:150-521:22. Mr. Cantu also stated, however, that he never confirmed the specific numbers for the "program" in writing because "he trusted Mr. Hsieh" and it "took six months to get [the terms] in writing with Sony, so I don't understand why it wouldn't be. It seems like it was in place already, so we – either direct or indirect, we get paid." Id.

Mr. Cantu's testimony is insufficient to establish that Quanta represented and/or promised that it would pay the amounts Redapt is seeking in this proceeding. By stating that its PCP program "was in place," Quanta did not make a "positive assertion" that it

10

would pay Redapt 1.5% in MDFs, 2% in rebates and/or 3% in commissions.  Even if Mr.

Cantu believed that to be true, Redapt's reliance on these general statements from Quanta,

made in a phone conversation and never confirmed in writing, is not reasonable.  As Mr.

Cantu's own testimony demonstrates, it took "six months" for the parties to agree to the

terms of the Sony contract and the commission rate was negotiated based upon pricing

specific to Sony.  Thus, the parties' prior course of conduct indicated that benefits on a

deal were not based upon the general existence of Quanta's PCP program, but upon deal-

specific negotiations, and those negotiations were memorialized in writing.  Mr. Cantu's

repeated attempts to get Quanta to memorialize, in writing, benefits under Quanta's PCP

program demonstrate that Mr. Cantu understood the parties needed to establish the

specific terms for Redapt's benefits and that that agreement should be in writing.  *See,

e.g.*. Ex 12,.

Redapt employees also testified that they believed Quanta represented and/or

promised that the terms of the Sony deal would apply to the Uber transaction.  *See, e.g.*,

RT 126 (Colello); 324-326 (Meyers).  Redapt produced an email that Mr. Cantu sent to

Mr. Hsieh memorializing an August 11, 2015 phone conversation in which Mr. Cantu

states that the parties discussed an "[a]gent program similar to Sony paid to Redapt from

Taiwan."  Ex. 80.  Redapt claims that this email is proof that Quanta made representations

or promises upon which Redapt reasonably relied in its decision to purchase Quanta

products for the Uber datacenter.

The August 11, 2015 email is insufficient to establish that Quanta made affirmative

statements or promises that the terms of the Sony Commission Agreement would apply to

11

the Uber deal.  Even if Quanta did make such statements, Redapt's reliance upon these statements, without more, was unreasonable.  Furthermore, even if the Sony Commission Agreement did apply to the Uber deal, that fact alone would not establish Redapt's entitlement to all of the damages it seeks.

The Sony Commission Agreement was executed two years earlier and, by its own terms, applied only to specific Sony products.  The agreement states that any change to the commission must be made via a "mutual written agreement of the parties," and thus Mr. Hsieh's oral statements could not alter that agreement. Ex. 13, §2.3.  Furthermore, the Sony contract provided for commissions on direct sales only and does not provide for any rebates or MDFs.  Thus Mr. Hsieh's purported statement that the terms of Sony Commission Agreement applied to the Redapt's purchases on behalf of Uber would not support Redapt's expectation that it would also receive 1.5% in MDFs or 2% in rebates.

Furthermore, when Mr. Cantu testified regarding his August 11, 2015 email, he explained that his notation that an "[a]gent program similar to Sony paid to Redapt from Taiwan," related to a project to build racks for Uber's datacenter in China, not the US, and that the China datacenter project did not go forward because Uber sold its business in China to DiDi.  RT 534:8-21; Ex. 80.  Thus, it is unclear whether Mr. Hsieh's comments in the August 11, 2015 conversation are even relevant to Redapt's purchases of equipment for the Uber datacenter in the United States.[2]

_____

[2] When prompted by Redapt's attorney, Mr. Cantu stated that the discussion on August 11, 2015 applied to any sales "whether U.S. or China," but the credibility of that statement is questionable given that Mr. Cantu initially testified that the communication related only to purchases destined for the China datacenter. There is no indication that Mr. Hsieh ever responded to Mr. Cantu's

There is evidence that in August of 2015, Quanta employee William Chen offered discounts to Redapt in exchange for Redapt's payment of its outstanding debt owed on several different purchase orders. *See,* Ex. 83 (Chen email offering Redapt discounts of 1% for early payment, 1% to contribute to "marketing development effort related to Uber," and 1% sales rebates). But these negotiations are insufficient to demonstrate that Redapt relied upon Quanta's representations that it would pay special benefits on Uber purchases because Mr. Chen's offer occurred *after* the Uber purchases occurred. Additionally, the discounts offered by Mr. Chen do not comport with the terms that Redapt is seeking in this proceeding.

Redapt's evidence is insufficient to prove that Quanta represented and/or promised that it would pay the rebates, MDF, and/or commissions that Redapt seeks in this proceeding in exchange for Redapt's purchases for Uber.

### 2. *Quanta's Representations Regarding its Preferred Channel Partner Program*

Most of the evidence Redapt offered in support of its claims is evidence that Quanta made general representations and/or promises regarding its PCP program that Redapt reasonably assumed applied to Redapt's purchases for Uber.

In 2012, Quanta stated that it was launching a PCP program under which Redapt could apply to become a "member" and receive "benefits" for any sales made under the program. *See,* Exs. 1, 2, 3, 4; RT 672:2-8, 409:8-410:11, 678:6-13, 679:1, 189:15-190:12, 325:2-326:7. Quanta also sent Redapt a document describing Quanta's PCP Program and

---

email on this point, nor any evidence of direct statements by Ms. Hsieh that he made the promises and/or representations that Mr. Cantu claims that he did.

an enrollment form, which Redapt filled out and returned to Quanta in 2012; thereafter,
Quanta frequently referred to Redapt as its "partner." Exs. 4, 6, 11, 12, 32, 40, 55; RT
489:14-495:13, 514:1-16.

Redapt employees who worked on the Uber deal testified that they believed the
deal was "registered" with Quanta. Mr. Meyers stated that he "registered" the Uber deal
with William Chen, but that he did so only in oral conversations that were never
documented. RT 281:22-282:15, 283:4-7. Mr. Meyers also testified that he did not have
"any specific discussion with William Chen about . . . the particular amounts of any
rebates" and that Quanta only promised that Redapt would "get the most competitive
pricing on Quanta gear." Nevertheless, Mr. Meyers stated that he "understood" that
Redapt would obtain "rebates . . . as well as MDF funds." RT 281:22-282:15, 283:4-7,
288:3-6. Mr. Meyers also testified that he had a phone conversation with Mr. Hsieh and
Mr. Cantu in which Mr. Hsieh stated that if Quanta told product directly to Uber, Quanta
would pay a commission, and Mr. Myers "understood" that the commission would be the
same 3.5% commission that Redapt obtained for the Sony deal. RT 325:13-16, 325:23-
326:7. As noted above, Mr. Cantu testified that he obtained "assurances that the
program" (*e.g.*, the PCP program) was ongoing and "still in place." RT 520:13-23. Mr.
Cantu also testified that the negotiations over the Sony deal were supposed to be "global"
(*e.g.*, apply to all sales for all customers) and he did not know "how it morphed into only
Sony-Gaikai." RT 325:23-326:7; 489:4-10.

In his trial testimony, Mr. Hsieh tried to distance Quanta from its representations
regarding its PCP program. Mr. Hsieh stated that he did not think Quanta had "launched"

14

a PCP program because although Quanta announced its program, it never confirmed the registration of any resellers.  RT 628:18-629:7. He claimed that no resellers qualified under the program and noted that Quanta never activated a website. Id.  Nonetheless, he admitted that Mr. Wong was authorized to announce Quanta's PCP program and acknowledged documents indicating that Quanta continued to publicize its PCP program long after Mr. Wong left Quanta.  RT 629:12-630:20.

Furthermore, documents demonstrate that the Quanta discussed giving Redapt discounts after the Uber purchases occurred.  In September of 2015, Redapt employee Andy Wahaus emailed Mr. Hsieh to confirm a phone conversation in which he and Mr. Hsieh discussed "the partner program for MDF dollars." Ex. 52.  Mr. Wahaus attached a copy of Quanta's PCP Program documentation and requested that Quanta submit a countersignature.  Mr. Hsieh failed to respond until Mr. Wahaus followed up in June of 2016, at which point Mr. Hsieh stated that he was "not authorized to sign the program," and passed the email chain to another Quanta employee, Jimmy Chin.  Id.  Mr. Chen then informed Mr. Wahaus that he spoke with "Jimmy" and that Quanta needed to add terms to the agreement to "make it more mutually-beneficial." Id.  Although Mr. Chen promised to follow-up the next day, there was no further communication regarding the agreement until September of 2016 when Mr. Cantu asked for an update on Quanta's countersignature.  Id.  It appears that no further communication occurred.

As noted above, there is also evidence that Quanta offered to "slowly work" a "discount system into all future sales" when the parties discussed the possibility that

Quanta would provide 1% in discounts and rebates in exchange for Redapt's payment of past due invoices, but that agreement was never executed.  Ex. 83.

Lastly, the evidence indicates that Redapt repeatedly sought Quanta's agreement on specific terms of its PCP program.  *See, e.g.*, Ex. 12.  Quanta never responded to these requests in any substantive way, but Quanta also never informed Redapt that it would *not* provide PCP benefits.  Indeed, emails between the parties indicate that Quanta suggested that the PCP program was available to Redapt as late June of 2016.  Ex. 52.

None of this evidence is sufficient, however, to establish that Quanta made representations and/or promises that are actionable and that support the specific damages Redapt seeks here.  Quanta's general PCP program documentation, which Quanta sent to Redapt in 2012, lacks sufficient detail to support Redapt's damages.  The document does not even mention the word "commission," and although the document does mention rebates, no specific percentages were promises or represented.  The PCP program documentation does state that Quanta would pay resellers 1.5% in MDFs, but only if resellers first complied with several conditions (*e.g.*, "POS reports from Authorized Dealers" and "approval of the proof of performance of the marketing activities") and Quanta only offered credits toward future sales, not a cash payout.  Ex. 4, p. 2.

Evidence of the parties' negotiations over the terms of Quanta's PCP program are also insufficient to establish that Quanta made actionable representations or promises that warrant payment of the damages sought by Redapt.  Although Redapt frequently suggested and/or requested specific benefit terms, there is no credible evidence that Quanta ever represented and/or promised that it would pay the specific amounts Redapt

16

seeks.  Quanta's general statements that Quanta's PCP program was "on-going" and "in place,' are insufficient because there is no evidence that Quanta's representations or promises were ever sufficiently specific to justify Redapt's reliance.  Negotiations that occurred after the Uber sale occurred do not support Redapt's claim because Redapt cannot claim that those conversations influenced Redapt's decision to purchase from Quanta.

Indeed, Redapt's repeated attempts to obtain Quanta's assent to specific benefit amounts for Quanta's global program, and Quanta's repeated evasion of those requests, indicates that Redapt should have suspected that Quanta did *not* intend to pay additional benefits under its PCP program.  *See, e.g.*, Ex. 12, pp. 2-4, Ex. 62.  Mr. Cantu apparently acknowledged the parties' failure to establish specific benefit terms in an email he sent to Mr. Hsieh in April of 2015 in which Mr. Cantu requested an increase in Redapt's credit limit.  After noting that other OEM's provided Redapt with larger credit lines, Mr. Cantu also noted that "other OEM's also extend us Rebates and Marketing programs." Ex. 46.

The evidence supports a conclusion that Quanta did, in fact, represent that it was willing to negotiate terms of a PCP program, but these representations do not support Redapt's requested damages.  To support its request for 2% in rebates, 1.5% in MDFs and/or 3.5% in commissions, evidence would have to support a conclusion that Quanta represented or promised to pay these specific amounts under its PCP Program.  Quanta's statements and representations regarding its PCP Program benefits lack definitive terms upon which an award could be granted on Redapt's behalf.  Furthermore, Redapt's multiple, unsuccessful attempts to obtain an agreement from Quanta as to the specific

benefits it would pay under its PCP program demonstrate that Redapt's purported reliance upon Quanta's statements was unreasonable.

The evidence also indicates that even if Quanta had made actionable representations regarding its PCP program benefits, generally, it is uncertain whether the Uber deal would have qualified for those benefits. Although Redapt employees stated that they "registered" the Uber deal with Quanta, the documents indicate that Quanta sold product destined for the Uber datacenter via the reseller Kovarus before Redapt even approached Quanta for pricing on the Uber's BOM. Ex. 19; RT 661-662. Redapt's assertion that it was the exclusive reseller under Quanta's PCP program for a deal in which Quanta was already engaged is not credible and there is no evidence that Quanta ever offered "dual-registration" in its PCP program.

### 3. *The Sony Commission Agreement*

Redapt also points to its communications with Quanta during the negotiations of the Sony Commission Agreement as evidence that Quanta agreed to pay Redapt 3.5% commission on *all* sales going forward.

As discussed above, the terms of the Commission Agreement indicate that the parties only agreed to commissions on the sales of certain Sony products. Ex. 13, §1.1 (defining "Approved Sony Products" as certain PlayStation 3 and 4 racks) and §2.1 (stating Quanta agrees to pay 3.5% sales commissions on "the Net Sale Price of Approved Sony Products"). The Commission Agreement was *product* specific and is insufficient to demonstrate that Quanta agreed to pay 3.5% commission on all sales to *Sony* let alone all sales to *any* customer, including Uber.

18

A review of the communications that led to the parties' execution of the

Commission Agreement indicate that Quanta's representations and offers related to the

Sony deal only.  When Redapt asked for 5% in commissions, Mr. Hsieh stated that the

"existing cost structure" of the deal required the parties to "sacrifice the margin at both

ends to keep the project," and that Quanta could only offer 3.5%.  Ex. 14; RT 499:24-

500.2.  When communicating the terms offered, Quanta stated "here is the proposed

content for the *Sony/Gaikai* case."  Ex. 14, p. 4 (*emphasis added*).  Although the parties

discussed a quarterly review of Redapt's commission rate, this term was memorialized in

the Commission Agreement, indicating that, again, the intended review applied only to the

commission paid on the specified Sony products.  Ex. 13, §2.3 ("the parties agree to

discuss adjustments to the Commission rate quarterly").  Furthermore, Redapt's

subsequent attempts to obtain Quanta's commit to a "formal program agreement"

undercut Redapt's claims that the parties had already reached a global agreement for all

future deals during their negotiations over the Sony deal.  *See, e.g.,* Ex. 62 (July 7, 2015

email from Redapt to Quanta, attaching a copy another resellers' program as suggested

terms for Quanta's program with Redapt.)

Redapt's evidence of the parties' communications during the negotiations of the

Sony Commission Agreement do not establish that Quanta made representations or

promises to pay the benefits that Redapt seeks with regard to the Uber project.

### C.   *Unjust Enrichment*

Redapt contends that Quanta was unjustly enriched by the profits it obtained from

the Uber sales because it enticed Redapt to purchase Quanta products for Uber by

19

promising to pay benefits that it never intended to pay.  Redapt by failing to honor its PCP program commitments with Redapt.

Quanta objects that there is no cause of action for "unjust enrichment."  Quanta is correct that certain districts of the California Court of Appeal do not recognize the claim. *See, e.g., McBride v Boughton*, 123 Cal.App.4th 379, 387 (2004) ("Unjust enrichment is not a cause of action . . . or even a remedy, but rather . . . a general principle, underlying various legal doctrines and remedies.")  Other districts have recognized the claim, however, indicating a split in authority.  *See, e.g., Peterson v. Cello Partnership*, 164 Cal.App.4th 1583, 1593 ("[t]he elements of an unjust enrichment claim are the receipt of a benefit and [the] unjust retention of the benefit at the expense of another.")  Regardless, courts "ignore "[e]rroneous or confusing labels ... if the complaint pleads facts which would entitle the plaintiff to relief" and courts that disavow claims "unjust enrichment" nonetheless allow for restitution if a party is "unjustly enriched at the expense of another." *McBride*, 123 Cal.App.4th at 389.  Thus, "[r]estitution may be obtained under a theory of "quasi-contract or assumpsit theory based on . .  tortious conduct."  *Id*.

"A person is enriched if the person receives a benefit at another's expense," but the "fact that one person benefits another is not, by itself, sufficient to require restitution." *McBride*, 123 Cal.App.4th at 389.   "The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is unjust for the person to retain it."  *Id*.

Quanta was not "unjustly enriched" by the profits it obtained from the sale of its product to Uber.  Quanta sold product that it designed and manufactured to Redapt, and

20

then directly to Uber.  The issue is not whether Quanta was "unjustly enriched" by these sales but rather whether Quanta represented or promised that it would sell these products to Redapt for a discounted price, or whether Quanta stated that it would give Redapt a portion of the profits it received when it sold these products directly to Uber.

As detailed above, although Quanta indicated that it might pay Redapt some form of kickback for the products purchased for Uber, the evidence does not support a conclusion that Quanta will be unjustly enriched unless it is forced to pay the rebates and commissions that Redapt hoped to obtain in the transaction.  The communications between the parties indicate that Quanta provided Redapt (and Kovarus) with a discount on the price of Quanta products destined for the Uber datacenter.  Redapt sold Quanta's product to Uber at a marked-up price and made a profit.  With regard to Quanta's direct sales, the evidence indicates that Uber sought to work directly with Quanta so that Uber could reduce its costs.  The party who benefited from Quanta' direct sales to Uber was Uber.

Redapt has not established that it is entitled to restitution as a remedy for unjust enrichment.

### D.   *Misappropriation of Trade Secrets*

In its final claim, Redapt asserts that Quanta violated California Civil Code § 3426.1 (commonly referred to as "CUTSA") by misappropriating Redapt's trade secreted pricing for the Uber deal.  Redapt claims that in 2016, Uber informed Redapt that it believed Redapt's margins for the Quanta products it resold to Uber were too high, and that Uber disclosed pricing information to Redapt that indicated Uber knew the specific

21

price points for the products Redapt purchased for Uber in 2015.  Redapt asserts that

Quanta revealed Redapt's margin to Uber.

To prove liability for misappropriation under CUTSA, Redapt must prove: (1) The

existence of a trade secret; (2) Misappropriation of that trade secret; and (3) The use of

improper means in misappropriating that trade secret.  Id.  A trade secret is defined as

information that: (1) derives independent economic value, actual or potential, from not

being generally known to the public or to other persons who can obtain economic value

from its disclosure or use; and (2) is the subject of efforts that are reasonable under the

circumstances to maintain its secrecy.  Id.  Confidential pricing information, such as the

markup on resold product, may qualify as a trade secret because the information may be

used by competitors to meet or undercut that pricing to usurp the deal.  *Whyte v. Schlage

Lock Co.*, 101 Cal.App.4th 1443, 1445 (2002).

Redapt employees testified that some time before 2016, Mr. Amiri informed

Redapt that it knew Redapt's costs "to the penny."  RT 328:11-12.  Redapt also points to

emails from 2016 in which an Uber employee sought direct pricing from Quanta,

specifically requesting the "Uber discount apply already [sic]" to "piggy back on the deal

what Sarah negotiated already."  Ex. 50.  In Quanta's internal communications regarding

the request, an employee stated that Quanta "never quote or negotiate the pricing directly

with Uber before. As you know, we all quote to Redapt, then Redapt quotes to Uber."  Id.

The employee authorized the release of pricing for the "Uber project via Redapt,"

however, because "even though the quote was through Redapt but [sic] Uber knows how

much we quoted to Redapt tho [sic]."  Id.; see also, Ex. 51 ("the unit price is how much

22

we've supported Uber project via Redapt.")  This conversation comports with Quanta's testimony that when Redapt first sought pricing for Uber from Quanta, Quanta informed Redapt that it had already established the "Uber assigned part" and that Quanta provided every system integrator with the same pricing for that part.  RT 722:3-723:9.

Redapt argues that Quanta misappropriated Redapt's trade secreted information when Quanta revealed its pricing to Uber because once Uber knew the amount Quanta charged to resellers, Uber could calculate Redapt's mark up.  Quanta's own pricing to resellers is not Redapt's trade secret, however.  Each of the players knew that Uber had obtained a set price for the "Uber assigned part" from Quanta, and Quanta had informed Redapt that it provided the same pricing to Kovarus, *e.g.*, Redapt's *competitor*.  Ex. 19. Furthermore, Redapt's evidence demonstrates only that Quanta provided Uber with 2016 pricing after Uber requested a direct quote in an email sent to both Quanta and Redapt. Ex. 85.  Uber also knew that Quanta had established a discounted price for Uber parts. Ex. 51.  Thus, Quanta provided Uber with the same pricing it gave to Redapt and Kovarus.  If these circumstances constitute a CUTSA violation, Quanta would be unable to sell its product directly to Uber without violating CUTSA; this is not the legislative intent behind Civil Code § 3426.1.

Redapt failed to prove that Quanta violated the CUTSA.

### E.     *Quanta's Request for Attorneys' Fees and Costs*

In its post-interim briefing, Quanta argued that, as the prevailing party, it is entitled to reimbursement of its reasonable attorneys' fees and costs pursuant to statute and in accordance with the arbitration agreement.  Redapt opposed Quanta's request.

23

### 1.   Statutory Attorneys' Fees

Quanta seeks reimbursement of a portion of its attorneys' fees and costs under

California Civil Code § 3426.4, which states:

> If a claim of misappropriation is made in bad faith, a motion to terminate an
> injunction is made or resisted in bad faith, or willful and malicious
> misappropriation exists, the court may award reasonable attorney's fees and costs
> to the prevailing party. Recoverable costs hereunder shall include a reasonable sum
> to cover the services of expert witnesses, who are not regular employees of any
> party, actually incurred and reasonably necessary in either, or both, preparation for
> trial or arbitration, or during trial or arbitration, of the case by the prevailing party.

Quanta argues that it is entitled to fees and costs under §3426.4 because Redapt's

misappropriation claim was made in bad faith.

Quanta cites *FLIR Systems, Inc.  v. Shapes, Inc.*, 174 Cal.App.4th 1270 (2009) as

instructive in determining whether "bad faith" occurred such that an award of fees and

cost is warranted.  "Bad faith" is determined by a "two-prong standard: (1) objective

speciousness of the claim, and (2) subjective bad faith in bringing or maintaining the

action, *i.e.*, for an improper purpose."  *Id*. at 1275.  "Objective speciousness exists where

the action superficially appears to have merit but there is a complete lack of evidence to

support the claim."  *Id*. at 1276.  In *FLIR*, the court determined that the claim was

objectively specious "because appellants suffered no economic harm and there was no

misappropriation or threatened misappropriation of trade secrets."  That is not the case

with regard to Redapt's claims.

As detailed above, Redapt employees testified that Mr. Amiri informed Redapt that

Uber knew Redapt's costs "to the penny."  RT 328:11-12.  The statement was made

24

during the same time period that Quanta had met with Uber and Redapt surmised that Quanta shared Redapt's markup with Uber personnel at that meeting.  Redapt also uncovered internal Quanta emails in which Quanta employees suggested that Uber already knew Quanta' quote to Redapt.  Ex. 50.  Although this evidence was, ultimately, insufficient to prove Redapt's misappropriation claim, it cannot be said that there was a "complete lack of evidence" to support Redapt's misappropriation claim.

Subjective bad faith is demonstrated "by evidence that [claimant] intended to cause unnecessary delay, filed the action to harass respondents, or harbored an improper motive."  *Id*. at 1278.  An inference of subjective bad faith may be drawn if the "plaintiff proceeds to trial after the action's fatal shortcomings are revealed by opposing counsel." *Id*.  Quanta points to an August 30, 2018 letter to Redapt in which it noted the weaknesses in Redapt's misappropriation claim and warned Redapt that it may be required to pay a fee award under §3426.4.  Quanta's February 19, 2019 Letter to Arbitrator, Ex. F.  In the letter, Quanta asserted that it was not prohibited from revealing its own pricing to Uber, and thus there was no trade secret violation, but at the hearing, Redapt asserted that Quanta had revealed *Redapt's* pricing, not Quanta's.  The Arbitrator considered and weighed the argument and all evidence submitted in support and ultimately determined that the evidence did not support a conclusion that Quanta revealed Redapt's margin to Uber; it was equally likely, if not more likely, that Quanta revealed its *own* pricing to Uber and Uber just "did the math" to determine Redapt's margin.  Thus, Redapt did not prevail on its misappropriation claim, but there is no indication that Redapt asserted the claim with "subjective bad faith."

Quanta's request for attorneys' fees and cost under California Civil Code § 3426.4 is denied.

### 2. *Contractual Attorneys' Fees*

Quanta seeks reimbursement of reasonable attorneys' fees and costs under the parties' Settlement Agreement.  Section 6 of the Settlement Agreement states:

> … The arbitrator may but is not required to award reasonable attorneys' fees and costs to the prevailing party.  Any such fees and costs shall not begin to accrue until the initiation of the demand for arbitration but shall include JAMS' filing fees for the Demand.  . . .

Quanta argues in the second paragraph of its February 19, 2019 letter to the Arbitrator that it is entitled to an award of attorneys' fees under Section 6 because Redapt "lacked a good faith basis to initiate and maintain this action."

As detailed above,  the Arbitrator finds that there was no "subjective bad faith" in this matter.  That finding disposes of Quanta's argument that it should be awarded fees under Section 6.

Additionally, the language in Section 6 that authorizes the Arbitrator to award fees (i.e. "[t]he arbitrator may but is not required to award reasonable attorneys' fees") provides no standard upon which the Arbitrator must rely to determine if fees are appropriate except.  The Arbitrator has total discretion to award fees if he so chooses, for his own reasons.  Because the standard set forth in the parties' agreement is vague and imprecise, the Arbitrator chooses to deny Quanta's request for attorneys' fees.

### 3. Costs.

The Arbitrator exercises his discretion to award costs pursuant to California Code of Civil Procedure §§1032 and 1033 in the amount of $93,807.96. This amount includes costs allowed under §1033.5(a) ($58,672.96) and arbitration fees allowed under §1033.5(c)(4) ($35,135).

Quanta's request to be reimbursed for the following costs is denied:

a. $27,247.03. Expert Fees not ordered by the court (Sec. 1033.5 b(1)).

b. $9,914.97. Graphic Artist (Sec. 1033.5 (c)(4)).

c. $1,049.64. Online Research (Sec. 1033.5 (c)(4).

d. $17,172.60. Transcripts of Court Proceedings not ordered by the court (Sec. 1033.5(b)(5).

### III.  Conclusion

1.    Redapt shall recover nothing on its claims for negligent misrepresentation, fraudulent misrepresentation, promissory estoppel, unjust enrichment and violation of California Civil Code §3426.1.

2.    Quanta is not entitlement to statutory attorneys' fees or costs under California Civil Code § 3426.4

3.    Quanta is not entitled to contractual attorneys' fees under Section 6 of the Settlement Agreement.

4.      Quanta is awarded $93,807.96 in costs under California Code of Civil

Procedure §§1032 and 1033.


IT IS SO ORDERED.

**DATED:**  April 12, 2019                          _____
                                                          Hon. William J. Cahill (Ret.)
                                                          Arbitrator

## PROOF OF SERVICE BY E-Mail

Re: Redapt, Inc. vs. QCT, LLC, et al
Reference No. 1100088763

I, Scott Schreiber, not a party to the within action, hereby declare that on April 12, 2019, I served the attached Final Arbitration Award on the parties in the within action by electronic mail at San Francisco, CALIFORNIA, addressed as follows:

Michael T. Callan Esq.
Peterson Russell Kelly PLLC
10900 N.E. Fourth Street
1850 Skyline Tower
Bellevue, WA  98004-8341
Phone: 425-462-4700
mcallan@prklaw.com
   Parties Represented:
   Redapt, Inc.

Robert M. Bodzin Esq.
Burnham Brown
1901 Harrison St., 14th Floor
PO Box 119
Oakland, CA  94604-0119
Phone: 510-444-6800
rbodzin@burnhambrown.com
   Parties Represented:
   Redapt, Inc.

Brian Y. Lee Esq.
PivotPointLaw
303 Twin Dolphin Dr.
Suite 600
Redwood City, CA  94065
Phone: 650-251-4200
blee@pivotpointlaw.com
   Parties Represented:
   QCH, Inc.
   QCT LLC
   Quanta Computer, Inc.

Paul Timothy Llewellyn Esq.
Nicolas Saenz Esq.
Lewis & Llewellyn LLP
505 Montgomery Street
Suite 1300
San Francisco, CA  94111
Phone: 415-800-0590
pllewellyn@lewisllewellyn.com
nsaenz@lewisllewellyn.com
   Parties Represented:
   QCH, Inc.
   QCT LLC
   Quanta Computer, Inc.

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco, CALIFORNIA on April 12, 2019.

Scott Schreiber
JAMS
sschreiber@jamsadr.com